

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40241-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAWSON RICHARD JARRETT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, A.C.J. — Dawson Jarrett appeals his conviction for vehicular homicide. He argues (1) the trial court violated his public trial right by excluding spectators from the courtroom during peremptory challenges, (2) the trial court erred in admitting a Snapchat video that was not properly authenticated, (3) he received ineffective assistance of counsel based on his attorney's failure to object to various witness testimony, (4) the prosecutor committed misconduct and the trial court erred in denying his related motions for mistrial, and (5) the trial court abused its discretion in granting the State's CrR 7.8 motion for resentencing.

We disagree and affirm. The courtroom closure was a de minimis violation of the public trial right and does not warrant reversal. The authentication argument was not preserved, and we decline to address it. Jarrett fails to establish ineffective assistance of

counsel. Nor does he demonstrate prosecutorial misconduct or an abuse of discretion in the denial of his mistrial motions. Finally, his challenge to the CrR 7.8 motion is not preserved and, regardless, the trial court did not abuse its discretion in granting the motion.

BACKGROUND

Gauge Ramsden was driving on McKenzie Woolard Road near Deer Park when a pickup truck rapidly approached from behind. The pickup attempted to pass him in the oncoming lane, but another truck appeared ahead. The pickup swerved back into Ramsden's lane, left the roadway, rolled, and struck a tree. Ramsden did not see who was driving the pickup.

Ramsden stopped and ran to the crash scene, finding the pickup overturned. Dawson Jarrett[1] was sitting on the ground near the bed of the pickup. Another man, later identified as Dylan Snitchuk, was lying unresponsive approximately 60 feet in front of the pickup. Ramsden checked for a pulse but found none. Another motorist performed CPR[2] on Snitchuk for several minutes until law enforcement took over.

At 12:30 p.m., Stevens County emergency dispatch received the first of two 911 calls reporting the crash. A Stevens County Sheriff's Deputy, Ryan Taylor, arrived on scene approximately 10 minutes later, followed shortly by EMS.[3]

---

[1] Jarrett is also known by the name "Dawson Slachter."
[2] Cardiopulmonary resuscitation.
[3] Emergency medical services.

2

Because Deputy Taylor was the first law enforcement officer on scene, his primary role was to render first aid. He saw Jarrett with a head wound, and another man receiving CPR. Jarrett told Deputy Taylor that he owned the pickup, but that Snitchuk had been driving.

Paramedics were unable to resuscitate Snitchuk, and he was pronounced dead at the scene. Jarrett was flown by helicopter to a hospital in Spokane for treatment.

Deputy Taylor and another deputy contacted witnesses, photographed the scene, and closed the road. During Deputy Taylor's investigation, he learned of a Snapchat video related to the crash suggesting Jarrett might have been driving. He viewed a grainy copy of the video, prompting him to begin a criminal investigation and take steps to preserve and gather evidence. He sent a preservation request to Snapchat to retain the video. A cell phone was seized as evidence, and the pickup was towed from the scene. Deputy Taylor also contacted the hospital and requested they obtain and preserve a blood sample from Jarrett.

Deputy Taylor thought the Washington State Patrol (WSP) would take over the investigation because the crash resulted in a fatality. He talked to a supervisor at WSP and was informed that because no detective was available, a Trooper would be sent to assist.

Almost three hours after the first 911 call, WSP Trooper Conner Bruchman arrived at the scene. He later testified that his only role was to assist with the

3

investigation because WSP was not the primary law enforcement agency assigned to the crash. Trooper Bruchman noticed that the crash scene appeared to have not been secured. He further noted that the Stevens County Sheriff's Office did not request to use WSP's advanced "total station" crash reconstruction equipment to take measurements.

Two days after the crash, Detective Travis Frizzell from the Stevens County Sheriff's Office was assigned as lead detective. At the subsequent trial, he testified that his supervisors made "terrible judgment calls" by accepting witness statements that Snitchuk was the driver and failing to treat the incident as a potential homicide investigation. As part of his investigation, he obtained warrants for Jarrett's medical records, the WSP Crime Laboratory to process the pickup, Jarrett's DNA, Jarrett's blood, and for the Snapchat video.

Detective Frizzell was present when the DNA swabs were obtained from Jarrett, and Detective Frizzell personally sealed, processed, and secured them in the county evidence facility. He also obtained a blood card containing a sample of Snitchuk's blood from the medical examiner's office. Another detective obtained samples of Jarrett's blood that was drawn while he was hospitalized.

A forensic scientist with the WSP Crime Laboratory examined Jarrett's pickup, and swabbed commonly touched areas including the steering wheel, gearshift, and window controls for DNA. She also collected samples from bloodstains on the driver's-

side visor. After logging and sealing the samples, she photographed the bags and turned them over to Detective Frizzell.

An evidence technician received the sealed swabs and samples. She documented them and then sent them to the lab for processing. She also checked in three vials of Jarrett's blood, which she received from the detective who obtained them in the hospital.

At the lab, another forensic scientist, Kaylene Bishop, analyzed the swabs and samples. She compared the results to the DNA samples from Jarrett and Snitchuk. She found that DNA from the steering wheel, gearshift, driver's side controls, and driver's side visor matched Jarrett, while DNA from the passenger door controls matched Snitchuk.

After Jarrett was released from the hospital, Detective Frizzell interviewed him at his parents' house. Jarrett admitted he and Snitchuk had been drinking and that he was initially driving at speeds up to 80 miles per hour before switching seats with Snitchuk, who then crashed. Jarrett acknowledged seeing the Snapchat video.

Based on Jarrett's statements, Detective Frizzell filmed himself driving the same route. Detective Frizzell knew the route well, having driven it numerous times throughout his career and having grown up in the area.

5

*Procedural History*

The State charged Jarrett with vehicular homicide, later amending the information by adding the egregious lack of remorse aggravating circumstance. The case proceeded to a jury trial.

At the end of voir dire, the trial court announced that the parties would begin exercising their peremptory challenges and described the process as "an extremely slow shuffle of one piece of paper amongst three stations." Rep. of Proc. (RP) at 246. The court went on to indicate, "we go off the record and you are permitted to stand up, kind of move around the gallery." RP at 246. The court asked that any "observers" leave the courtroom and sit in the hallway during this process, adding "you're not gonna miss anything." RP at 246. A short time later, the recording was turned on, and the trial court announced the jury. The jury seating chart was filed the same day, showing the peremptory challenges exercised by each party

In opening statements, both parties identified the central issue as whether Jarrett or Snitchuk had been driving. The prosecutor also foreshadowed a recurring theme about the flaws in the initial investigation:

> Unfortunately . . . the State has to admit a little—a little less than perfect procedure. Everything that was done, was done correctly, but we admit that it wasn't perfect. And that's the—that's perhaps the issue. And part of why it was found to be not perfect, is because initially, the

> investigators on scene thought that Mr. Jarrett was the passenger. Because why? Because that's what they were told.

RP at 359.

The State called the crash witnesses, first responders, law enforcement officers, forensic scientists, and evidence technicians who all testified consistently with the facts above. The State also called the coroner, medical examiner, and other investigators whose testimony is described in detail when analyzing the relevant issues below.

During Detective Frizzell's testimony, the court admitted the video he recorded while driving the route Jarrett and Snitchuk had taken before the crash. Detective Frizzell testified that the video demonstrated that the speeds Jarrett claimed to have driven were unsafe and the landmarks in his video matched those visible in the Snapchat video. The court also admitted the last portion of the Snapchat video, over defense counsel's objection. After the Snapchat video was played, the prosecutor asked Detective Frizzell to identify the final location shown. He testified that the location was consistent with the roadway and landmarks depicted in the video of him driving the route.

During closing argument, the prosecutor played the Snapchat video for the jury again, then stated:

> And so, of course, that's the video that started the investigation on the right path. The wrong path was started by the statement by Mr. Jarrett at the time of the scene—at the scene of the accident when he spoke to law enforcement and he told them that he was the passenger. And they went on the wrong foot—they got—their trajectory was wrong, but it was fixed. . . .

7

> Because they were acting as though it was a death investigation; because there was a death—again, no question about that.
> *So we righted the ship*, if you will.

RP at 2129-30 (emphasis added). Defense counsel immediately objected, arguing that the prosecutor was vouching. The court sustained the objection and instructed the jury to disregard the emphasized statement above.

Following trial, the jury found Jarrett guilty of vehicular homicide. By special verdict, the jury also unanimously found that Jarrett operated the truck in a reckless manner and with disregard for the safety of others. The jury did not unanimously find that he was intoxicated.

The trial court sentenced Jarrett, based on an agreed offender score of "0," to 102 months of confinement and 18 months of community custody. But Jarrett's felony judgment and sentence reflected a 2018 juvenile conviction for vehicular assault that was not counted toward Jarrett's offender score.

*Post Trial Procedure*

One week later, the State moved for relief from judgment under CrR 7.8 citing an "erroneously calculated offender score." Clerk's Papers (CP) at 354. Defense counsel objected on double jeopardy and estoppel grounds. After a hearing, the court granted the motion, vacated the judgment, and resentenced Jarrett based on an offender score of "2" to 110 months of confinement and 18 months of community custody.

Jarrett appeals.

ANALYSIS

1.  COURT CLOSURE

Jarrett contends the trial court violated his public trial right by closing the

courtroom to spectators during the exercise of peremptory challenges without first

conducting the analysis required under *State v. Bone-Club*.[4]  He argues the closure was

not de minimis because jury selection is a critical stage of trial that should remain open to

the public.  The State responds that the closure was de minimis and does not warrant

reversal.

Article I, section 22 of the Washington Constitution and the Sixth Amendment to

the United States Constitution guarantee an accused the right to a public trial.  *State v.*

*Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012).  Potential violations of a defendant's public

trial right are reviewed de novo.  *Id*.

"[N]ot every interaction between the court, counsel, and defendants will implicate

the right to a public trial, or constitute a closure if closed to the public."  *State v. Sublett*,

176 Wn.2d 58, 71, 292 P.3d 715 (2012).  The public trial right is only implicated by

certain trial proceedings established by our Supreme Court.  *State v. Wilson*, 174 Wn.

App. 328, 335, 298 P.3d 148 (2013).  Relevant in this case, it is well settled that the

public trial right attaches to jury selection, and for cause and peremptory challenges.

*State v. Schierman*, 192 Wn.2d 577, 609, 438 P.3d 1063 (2018).

---

⁴ 128 Wn.2d 254, 906 P.2d 325 (1995).

If a defendant's public trial right is implicated, we next determine whether there

was a closure without a *Bone-Club* analysis.[5] *State v. Paumier*, 176 Wn.2d 29, 35, 288

P.3d 1126 (2012). If a closure occurs without a *Bone-Club* analysis, the error is structural

and usually warrants a new trial. *Id*. Nevertheless, the doctrine of "de minimis error"

can apply to certain public trial right violations. *Schierman*, 192 Wn.2d at 614. For

example, in *Schierman*, a trial court ruled on hardship and for cause challenges to

potential jurors in chambers. *Id*. at 598-99. Following the court's rulings, the judge,

lawyers, and court reporter returned to the courtroom and explained on the record what

had occurred in chambers. *Id*. at 599-600. Our Supreme Court ultimately held:

> [W]e adopt a limited de minimis exception to our rule of automatic reversal
> for all violations of the public trial right . . . we hold that the 10-minute
> closure at issue here—to which there was no objection and which involved
> no juror questioning, witness testimony, or presentation of evidence, and

---

[5] A *Bone-Club* analysis consists of five criteria the trial court must weigh:

> "1. The proponent of closure or sealing must make some showing
> [of a compelling interest], and where that need is based on a right
> other than an accused's right to a fair trial, the proponent must show
> a "serious and imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given
> an opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least
> restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of
> closure and the public.
> 5. The order must be no broader in its application or duration than
> necessary to serve its purpose."

*Id*. at 258-59 *(*quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11,
848 P.2d 1258 (1993).

10

was simultaneously transcribed and immediately afterward memorialized in open court—was a de minimis violation of the right to a public trial.

*Id*. at 615.

In this case, a closure occurred when the trial court asked the spectators to leave the courtroom. The closure implicated Jarrett's public trial right because it occurred while the attorneys were deciding peremptory challenges. *See Id*. at 609. And the trial court erred when it closed the courtroom without conducting a *Bone-Club* analysis. *See Paumier*, 176 Wn.2d at 35. The question becomes whether that error requires reversal.

We conclude that the closure was de minimis. As in *Schierman*, there was no objection to the closure. In addition, the exercise of writing down peremptory challenges on paper involved "no juror questioning, witness testimony, or presentation of evidence." *Schierman*, 192 Wn.2d at 614. Moreover, the empaneled jurors were announced in open court, and the written peremptory challenges were filed in the court record. Thus, like in *Schierman*, the closure in this case constituted de minimis error that does not warrant reversal.

2.   ADMISSION OF SNAPCHAT VIDEO

Jarrett contends the trial court erred in admitting the Snapchat video because the State failed to authenticate it under ER 901, arguing that no witness testified to when, where, or by whom the video was created, and that the Snapchat custodian's certificate merely showed the video was posted on the site. He asserts he is entitled to a new trial. The State responds that this issue is not preserved because defense counsel's objection at

11

trial was focused on the chain of custody for the exhibit, not authenticity. Alternatively, the State argues that the video was properly admitted because it was accompanied by a custodian's certificate and authenticated through testimony. We agree with the State that the issue is unpreserved, and we decline to review it.

### A. Additional Background

Deputy Taylor testified that after the crash he learned of a Snapchat video related to the crash. He viewed a copy of the video, which showed Jarrett could have been the driver, prompting him to begin a criminal investigation and take steps to preserve evidence, including sending a preservation request to Snapchat to retain the video.

Law enforcement later obtained a search warrant for Snapchat records. Snapchat responded with several combined videos and a certificate of authenticity. Detective William Bitton downloaded the videos from Snapchat and provided them to Detective Frizzell. Detective Frizzell initially testified that he received the videos from Detective Bitton on a thumb drive, viewed them, then forwarded the thumb drive to the prosecutor's office. The State then sought to admit only the last few seconds of the Snapchat video, conceding that the videos from the night prior were overly prejudicial. However, the Snapchat video was contained on a CD marked as exhibit P-42, not a thumb drive.

Defense counsel raised an authenticity objection. He argued there was no proof that the video on the CD was the same video provided by Snapchat, pointing out that the

video contained no reference to the internal reference number on the certificate of authenticity. The court sustained defense counsel's objection and instructed the prosecutor to lay additional foundation.

Detective Frizzel provided additional testimony that failed to explain how the Snapchat videos were placed on a CD. He was, however, able to explain that the videos covered a three-day window matching the dates on the warrant. Defense counsel again objected to the admission of the videos, arguing that Detective Frizzell was unable to establish that the video on the CD was the same video that was received from Snapchat. The court again sustained defense counsel's objection.

Finally, following a recess, Detective Frizzell testified that after reviewing his report he realized he was mistaken as to how he had received the videos from Detective Britton. Detective Frizzell explained that he received a CD containing the Snapchat videos from Detective Britton. The videos were then transferred to the sheriff's records office, who then transferred them to the prosecutor's office on a thumb drive.

The prosecutor then called his paralegal, who testified that she received a thumb drive from the sheriff's office containing the videos and other photographs.

The prosecutor then renewed his motion to admit the Snapchat video contained on a CD. Defense counsel renewed his objection, arguing chain of custody:

> [W]ell, there's certainly an issue regarding authentication of what was received from a snapchat. And so apparently what was originally received from snapchat when [sic] onto some kind of a— a CD. It came in a zip file,

13

was loaded onto a CD. And then apparently went into some sort of a file at the sheriff's department where it was comingled with whole bunch of other data. And then put onto a—a flash drive, not a flash, a thumb drive, and shows up in the prosecutor's office. So, there's been comingling of whatever it came in and was authenticated by a document that we have. So, I have—my objection is to we can't authenticate whatever it was on that zip file or the CD that it originally came in. And without that authentication we—we just don't know is what I—what is what on all that information that was sent down to the prosecutor's office. So, there's been—there's an issue in regards to the authentication and the—the record that was received from snapchat. So, that's my objection, Your Honor.

RP at 1124. The court ultimately overruled defense counsel's objection and admitted the last Snapchat video in exhibit P-42. The video was then played for the jury, and Detective Frizzell identified the location depicted in the video as matching the locations in the Snapchat video.

### B. Error Preservation

On appeal, Jarrett argues the trial court abused its discretion by admitting the video because no witness testified that the video was an accurate depiction of the events at a certain time and location. The State argues that this argument is not preserved because defense counsel's trial objections focused on the chain of custody and handling of the file, not whether the video was an accurate depiction of the events portrayed.

We generally decline to review an issue raised for the first time on appeal. *See* RAP 2.5(a). "The rule reflects a policy of encouraging the efficient use of judicial resources. The appellate courts will not sanction a party's failure to point out at trial an

14

error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial." *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). The rule derives from the principle that trial counsel is obligated to seek a remedy for errors as they occur, or shortly thereafter. *See City of Seattle v. Harclaon*, 56 Wn.2d 596, 597, 354 P.2d 928 (1960).

As a general rule, "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). Under this rule, physical evidence that is not readily identifiable is authenticated through testimony that shows chain of custody, demonstrating that the evidence remains intact and unaltered from the time it was collected until trial. *See State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). On the other hand, evidence that is unique or readily identifiable can be authenticated by a witness who testifies that an item is what it purports to be. *Id.*

Unlike physical evidence, photographs and videos are usually authenticated by a witness who testifies that the photograph or video is an accurate depiction of the scene. *State v. Sapp*, 182 Wn. App. 910, 332 P.3d 1058 (2014). This is a low bar, and the authenticating witness does not need to have witnessed the events or be the person who took the photograph. *Id.; see also State v. Tatum*, 58 Wn.2d 73, 360 P.2d 754 (1961).

Here, defense counsel raised an objection that focused on chain of custody: whether the video in exhibit P-42 was the same video received from Snapchat. Counsel

did not raise the objection being raised on appeal: that the State failed to show that the video was an accurate depiction. It is possible that defense counsel was strategically waiving an "accurate depiction" objection at trial because counsel believed the State would meet this low bar. Regardless, the failure to raise an "accurate depiction" objection means that the State and the trial court were deprived of an opportunity to correct any perceived deficiencies. Thus, the issue is waived on appeal. *See State v. Roberts*, 73 Wn. App. 141, 867 P.2d 697 (1994) (defendant waived objection to admissibility of radar gun results by failing to make proper authentication objection).

3. INEFFECTIVE ASSISTANCE OF COUNSEL

Jarrett contends his trial counsel provided ineffective assistance in several different instances. We discuss each of his arguments after a review of the relevant standards.

*A. Standard of Review & Legal Principles*

Criminal defendants have a constitutional right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). "We review claims of ineffective assistance of counsel de novo." *State v. Hamilton*, 179 Wn. App. 870, 879, 320 P.3d 142 (2014).

Washington courts follow the *Strickland*[6] standard when determining whether a

defendant received ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32,

246 P.3d 1260 (2011). A defendant bears the burden to show that (1) defense counsel's

performance fell below an objective standard of reasonableness and, if so, (2) "'there is a

reasonable probability that, but for counsel's deficient performance, the outcome of the

proceedings would have been different.'" *Grier*, 171 Wn.2d at 32-35. If either prong is

not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

With regard to the first prong, "[w]hen counsel's conduct can be characterized as

legitimate trial strategy or tactics, performance is not deficient." *Id*. at 863. To show

deficient performance, "the defendant must [demonstrate from] the record the absence of

legitimate strategic or tactical reasons" for counsel's conduct. *State v. McFarland*, 127

Wn.2d 322, 336, 899 P.2d 1251 (1995). "[W]hether to object is a classic example of trial

tactics." *State v. Madison*, 53 Wn. App. 754, 763, 770 P.2d 662 (1989). In the context of

objections, Washington courts presume "that the failure to object was the product of

legitimate trial strategy." *State v. Johnston*, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007).

"If a defendant centers their claim of ineffective assistance of counsel on their

attorney's failure to object, then 'the defendant must show that the objection would likely

have succeeded'" to show deficient performance. *Vazquez*, 198 Wn.2d at 248. "'Only

---

[6] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal.'" *Id*. Similarly, "[d]efense counsel's failure to object [during the] prosecutor's closing argument [generally does] not constitute deficient performance," as attorneys customarily refrain from objecting during closing unless the argument contains egregious misstatements. *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014).

As for the second prong, a defendant must affirmatively prove prejudice, not simply show that "the errors had some conceivable effect on the outcome." *Strickland*, 466 U.S. at 693. A defendant demonstrates prejudice by showing that the proceedings would have been different but for counsel's deficient representation. *McFarland*, 127 Wn.2d at 337. The ultimate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. When reviewing prejudice, we consider the totality of the evidence. *Strickland*, 466 U.S. at 695.

B. *Treating Physician's Testimony*

Jarrett first contends his trial counsel was ineffective for failing to object to testimony from the orthopedic surgeon who treated him at the hospital following the crash. The surgeon produced a medical report documenting Jarrett's history of present illness when treating Jarrett after the crash. During the doctor's testimony, the prosecutor asked about a portion of the report:

Q    In the second paragraph, you said patient was an unrestrained driver at high speeds, he just got a new truck and his friend was driving. So, that seems to be contradictory, can you explain that contradiction please?

A    I cannot explain that contradiction.  I know that's my notes, but.

Q    So, do you know whether he was an unrestrained driver?

A    I do not.

Q    Okay. Do you know if his friend was driving?

A    I do not know, yeah.

RP at 779.

Jarrett argues that defense counsel was ineffective for failing to object and invoke physician-patient privilege.[7]  He argues that if defense counsel had invoked the privilege, the objection would have been granted and the jury would not have heard the contradictory statement about who was driving.  The State responds that the privilege does not apply.[8]

---

[7] The physician-patient privilege is statutory, derived from RCW 5.60.060(4), and is applied in the criminal context via RCW 10.58.010.  *State v. Smith*, 84 Wn. App. 813, 820, 929 P.2d 1191 (1997).  The privilege protects statements made in the course of treatment.  *State v. Salas*, 1 Wn. App. 2d 931, 950, 408 P.3d 383 (2018).  In criminal cases, "[a]pplication of the privilege requires a balancing of the benefits of the privilege against the public interest of full revelation of the facts."  *State v. Stark*, 66 Wn. App. 423, 438, 832 P.2d 109 (1992).  Even when the privilege applies, the party asserting it can waive it.  *Smith*, 84 Wn. App. at 822.

[8] The State also argues that Jarrett waived the privilege when defense counsel cross-examined a different doctor about his injuries and admitted an exhibit during that testimony.  This argument is unpersuasive.  It is unsupported by authority, and the State does not explain how defense questioning of a different doctor, well after the orthopedic surgeon had testified, could operate to waive the privilege retroactively.

19

We conclude that even if Jarrett could establish deficient performance, he fails to show prejudice. His entire prejudice argument is that failing to object "resulted in prejudice to Mr. Jarrett. His whole defense centered around who was driving the vehicle. There was no tactical reason for failing to object as a contradictory statement about the key issue weakened the defense." Appellant's Br. at 36. But Jarrett does not explain how this testimony "weakened his defense" or would have given the jury reasonable doubt about his guilt. The surgeon expressly stated he did not know who was driving and could not resolve the contradiction in his notes. Jarrett's conclusory claim does not demonstrate a reasonable probability of a different outcome. Because Jarrett fails to show prejudice, this claim of ineffective assistance fails.

*C. DNA Expert's Testimony*

Jarrett next contends his trial counsel was ineffective for failing to object to testimony about the results of the DNA tests because the State failed to establish the chain of custody.

He first argues that counsel was deficient for not objecting when Detective Frizzell testified that he obtained a blood card containing Snitchuk's blood. He asserts there was no testimony about when or by whom the sample was collected. This argument fails. Defense counsel did object to Frizzell's testimony about obtaining the blood card from the medical examiner, arguing that foundation had to be laid by another witness. The

trial court sustained the objection. Because counsel did object, Jarrett cannot establish

deficient performance.

Jarrett next argues that counsel was ineffective for failing to object to the

testimony of the DNA expert because the chain of custody was incomplete. The State

responds that the chain of custody was sufficiently established. We agree with the State.

As noted above, "evidence [that] is not readily identifiable and is susceptible to

alteration by tampering or contamination . . . is customarily [authenticated] by the

testimony of each custodian in the chain of custody from the time the evidence was

acquired." *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). This "test

requires the proponent to establish a chain of custody 'with sufficient completeness to

render it improbable that the original item has either been exchanged with another or

been contaminated or tampered with.'" *Id*. at 436 (emphasis omitted) (quoting *United

States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989)). "Factors to be considered

include the nature of the item, the circumstances surrounding the preservation and

custody, and the likelihood of tampering or alteration." *Id.* Importantly, the "proponent

need not identify the evidence with absolute certainty and eliminate every possibility of

alteration or substitution." *Id.* "'Minor discrepancies or uncertainty on the part of the

witness will affect only the weight of the evidence, not its admissibility.'" *Id.*

As an initial matter, Jarrett's argument is not entirely clear. The State presented

multiple forensic scientists, yet Jarrett does not identify which witness's testimony he

believes was objectionable. Instead, he characterizes various witnesses' testimony in general terms. His passing treatment of this issue is insufficient. *See Holland v. City of Tacoma*, 90 Wn. App. 533, 537-38, 954 P.2d 290 (1998).

Nevertheless, the crux of his claim seems to be that forensic scientist Bishop gave no testimony linking the samples she examined with the items collected from the pickup and from Jarrett, and that there was no testimony about identifying information on the samples corresponding to items in the evidence facility. The record demonstrates otherwise.

One forensic scientist testified that she obtained DNA samples by swabbing the pickup, labeled where the samples were taken from, sealed the samples, logged them, placed them in bags, sealed the bags for security, then signed the evidence over to Detective Frizzell. The sealed bags were photographed. Another detective testified that he obtained vials of Jarrett's blood from hospital staff pursuant to a warrant and delivered them to the Stevens County evidence facility, explaining that the vials never left his sight.

An evidence technician testified about receiving the blood vials from the detective and checking them into the evidence facility, explaining that she tagged the vials with the date and time then put them into the refrigerator. She then received a lab request from Detective Frizzell, which caused her to send the vials to the lab, which confirmed receipt of the vials, tested them, then returned the vials to her. She also testified that she obtained the swab samples from the evidence locker, assigned them numbers, tagged

22

them, and sent them to the lab for testing, then received them back. She detailed the procedures and security measures ensuring the evidence was not tampered with.

Forensic scientist Bishop testified that she received those samples and conducted DNA testing against the reference samples from Jarrett and Snitchuk. Taken together, this testimony established a sufficient chain of custody. As a result, any objection on chain of custody grounds would have likely failed. Thus, defense counsel was not deficient for failing to object on this ground. Because Jarrett fails to show deficient performance, this claim fails.

### D. Coroner's Testimony

Jarrett contends his trial counsel was ineffective for failing to object to testimony from the coroner. He contends the coroner's testimony violated the best evidence rule, hearsay rule, and offered impermissible opinion testimony. We conclude that Jarrett's argument fails.

The State called the coroner, who testified on direct examination that she prepared a report related to the crash. On cross-examination, defense counsel asked about her conversation she had with a deputy at the scene:

> Q    And you had a conversation with Deputy Evans, is that correct?
> A    Yes.
> Q    And did Deputy Evans—isn't it true that Deputy Evans advised you that the—the deceased had—he had information that the deceased was the driver of the vehicle?
> A    If you're asking about the conversation, he advised me that the surviving individual claimed that the decedent was the driver.

23

Q      All right.  And did—and he—did you dispute that with him?
A      Yes.

RP at 1191.

On redirect, the prosecutor asked the coroner to explain what she meant:

Q      Ms. Colvin, you told [defense counsel] that you were—you disputed with Deputy Evans the assertion that Mr. Snitchuk was the driver. Could you tell us what you meant by that?
A      I said that in my experience and finding that the vehicle was less than two weeks old, that I highly doubted that the decedent was the one driving the vehicle.  The paperwork for the vehicle was in the car, as well as—
[Defense Counsel]:  Your Honor, I'm going to object as to any hearsay. I don't know what she—I don't—I have no idea what she's going to say beyond what she's said now, so I want checked in that I believe she may be.
[The prosecutor]:  So the State would move to strike the objection, Your Honor.
THE COURT: Okay.  And so I—yes.
[DEFENSE COUNSEL]: Okay.  I'll withdraw the objection.
THE COURT:  I think so.  We're not—we're not quite ready for an objection.
[THE PROSECUTOR]   Were you able to finish your statement, Ms. Colvin?
A      So I discussed with Deputy Evans that I felt, in my experience, that he was most likely the driver and we needed to treat it as he was the driver—the alive person was still the driver and it needed to be treated as a homicide—vehicular homicide possibly.

RP at 1200-01.

On appeal, Jarrett first argues that the coroner's testimony was an impermissible

opinion on guilt.  No witness may testify to their personal opinion on a defendant's guilt,

the intent of the defendant, or the veracity of a witness.  *State v. Montgomery*, 163 Wn.2d

24

577, 591, 183 P.3d 267 (2008). However, "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." ER 704.

"Whether testimony constitutes an impermissible opinion on guilt or a permissible opinion embracing an 'ultimate issue' will generally depend on the specific circumstances of each case." *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993).

> To determine whether statements are impermissible opinion testimony, a court will consider the circumstances of a case, including, "(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact."

*State v. King*, 167 Wn.2d 324, 332-33, 219 P.3d 642 (2009) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007)). "[T]estimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *Heatley*, 70 Wn. App. at 578.

Here, on cross-examination, defense counsel asked the coroner about her conversation with Deputy Evans regarding who was driving the pickup. By eliciting that she disputed Deputy Evans's statement that the decedent was the driver, defense counsel introduced the subject of the coroner's views on the matter. On redirect, the prosecutor asked the coroner to clarify her answer to defense counsel's question. She explained that

25

based on her experience, the age of the vehicle, and paperwork for the pickup found at the scene, she believed Jarrett was most likely the driver and the incident should be treated as a possible vehicular homicide.

Although Jarrett characterizes this testimony as an impermissible opinion on guilt, it was not a direct comment on whether Jarrett committed the charged crime. Rather, it tangentially addressed the disputed factual issue of who was driving, relying on inferences drawn from the evidence and the coroner's experience. Because the coroner's testimony did not amount to an opinion on Jarrett's guilt, any defense objection would have likely failed. Thus, defense counsel was not deficient for failing to object on futile grounds.

Jarrett next argues that the coroner's testimony about the contents of the documents concerned the sale of the pickup. He contends this testimony violated the rule against hearsay[9] and the best evidence rule.[10] These arguments are without merit. Defense counsel objected before the coroner described any specific contents of the paperwork, then withdrew his objection, presumably because the coroner had not

---

[9] Under ER 802, "Hearsay is not admissible except as provided by these rules, by other court rules, or by statute." "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c).

[10] The best evidence rule, contained in ER 1002, provides: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by rules adopted by the Supreme Court of this state or by statute."

described the contents of the paperwork. The coroner never actually testified to the substance of the paperwork. Thus, her testimony did not implicate hearsay or the best evidence rule, and any objection on those grounds would have been meritless and failed. Because Jarrett fails to show deficient performance, this claim of ineffective assistance fails.

### E.  Detective and Investigator Testimony

Jarrett contends his trial counsel was ineffective for failing to object to testimony from State witnesses that Jarrett characterizes as vouching and impermissible opinion on his guilt. The State argues that none of the testimony identified by Jarrett constituted vouching or an opinion on guilt.

In support of his argument, Jarrett provides generalized characterizations of the trial testimony, asserting that an investigator criticized law enforcement's initial investigation because law enforcement initially assumed they were dealing with a deceased driver-caused accident. This characterization does not accurately reflect the investigator's testimony.

Instead, Detective Frizzell testified that responding officers made mistakes by accepting initial statements that attributed the incident to driver error without considering the possibility of a homicide. As a result, standard procedures such as having WSP process the scene, were not followed and critical evidence was not preserved. In

explaining the difficulty of trying to remedy these errors, Detective Frizzel explained that

he attempted to organize the evidence and determine if a crime was committed:

> [I d]id what I could. Tried to decide what evidence was important, what we
> needed to save. You're guessing the entire time. You don't know what
> there is, where it's at. So, we try to prioritize that our evidence we feel will
> show one way or the other, because again, it's when I take a case, I have
> information he was a passenger. I have information he was also the driver.
> We may have a crime. We may not have a crime. My job as the lead
> investigator, is to try to organize and gather the evidence that will show one
> way or another. And I have to guess and I have to try to prioritize what
> we're gonna lose that I know we're gonna lose. What is gonna be there for
> some time or we can find out later. And it's kind of dynamic and complex.

RP at 957.

Similarly, an investigator with the prosecutor's office in Stevens County testified

that he was hired because law enforcement in this case made the fundamental mistake of

failing to treat this scene, like every scene with a fatality and survivor, as a possible

homicide, explaining:

> Q  You were hired because the investigation was lacking, correct?
> A  Correct.
> Q  And do you know who—you testified that Deputy Evans—you
> think you might have read his report. Would it surprise you to learn he
> didn't write one?
> A  *I was surprised and being a senior officer, especially when there is
> a—there is a deceased person at the scene and a coroner is called—every
> scene is a—is treated as a—as a homicide. But the senior officer on scene
> dictated otherwise. He had the information that—that the deceased was
> driving and made that conclusion prior to any follow-up investigation at
> all.*

> *Q      And in your years of experience doing investigations and being a law enforcement officer, it's fair to say that was a mistake in your judgment, was it not?*
> *A      It was a mistake on his part, yes.*
> *Q      A fundamental mistake.*
> *A      Yes.*
> Q      And thus your involvement in the case.
> A      Well, my involvement obviously came after the fact, *but the ship was righted right* [sic] *shortly thereafter when it became clear that this was more than just a driver-causing deceased.*
> Q      So the—the ship being righted—the error that was made early on in the case was corrected, is that what you mean?
> A      Yes.

RP at 1736-37 (emphasis added).

Jarrett characterizes the "ship was righted" testimony above as vouching for the State's case and expressing an implicit opinion that Jarrett was the driver.

No witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference. *State v. Garrison*, 71 Wn.2d 312, 315, 427 P.2d 1012 (1967). "Opinion testimony on a core issue of guilt or witness veracity is a form of vouching." *State v. Lang*, 12 Wn. App. 2d 481, 488, 458 P.3d 791 (2020). "Because vouching testimony invades the province of the jury and jeopardizes the right to a fair trial, it is constitutionally prohibited." *Id*. at 489.

Here, neither Detective Frizzell nor the investigator testified that they believed Jarrett was guilty, that his defense lacked merit, or that the jury should believe one witness over another. Contrary to Jarrett's argument, they did not testify or imply that

29

law enforcement's "mistake" was the failure to conclude that Jarrett was the driver. Instead, these witnesses testified that the investigative error was law enforcement's failure to treat every accident scene of this nature, including this one, as a potential crime scene. Nor did the investigator vouch for the State's case when he indicated that the ship was subsequently righted. His comment simply referenced his previous testimony that law enforcement failed to initially treat the accident as a potential crime scene, thereby failing to gather evidence right after the accident.

Because the testimony was not improper, any objection would have failed, and counsel was not deficient for failing to raise futile objections. This claim of ineffective assistance therefore fails.

4. PROSECUTORIAL MISCONDUCT

Jarrett argues that the prosecutor committed reversible misconduct. Alternatively, he argues the trial court erred by denying his four motions for a mistrial. The State contends that the prosecutor did not commit misconduct and that the trial court did not err in denying the motions.

*A. Additional Background*

During the State's case, outside the presence of the jury, the court and parties discussed the expected testimony of WSP Detective Troy Corkins who worked as an accident reconstructionist. The parties anticipated Detective Corkins would testify about the location of Jarrett and Snitchuk in the pickup. Defense counsel objected to the

30

proposed testimony, arguing that the Trooper did not have biomechanical engineering

expertise that would qualify him to testify about where the occupants were seated in the

pickup. The court ruled that Detective Corkins could testify as an accident

reconstructionist about the cause of the accident, but that he was not qualified to testify

on the mechanism of the injuries and where Jarrett and Snitchuk were seated.

Specifically, the court ruled:

> Detective Corkins is—has the requisite training and experience and is—at least in this Court's opinion—qualified to testify as an expert as far as accident reconstruction in this case. What he describes is he's asked to determine ultimately how the crash occurred and answer the question as to why.
>
> *With respect to his brief testimony about occupant kinetics and the mechanism of injury, where he reviews the injuries of the—the people in the vehicle to determine where they were seated, that may be appropriate for a case that he's actually reviewed that information, but has not in this case.*
>
> According to his testimony, the medical information he reviewed is limited to a full body X-ray picture that was supplied by Trooper Bruchman, which is not sufficient, even if he were qualified to base an opinion about both occupants of the vehicle on one body X-ray. *But it does not appear from the record and the testimony of this Witness that he is qualified to testify as to the biomechanics and connecting injury – injuries to, I guess, causation of injury in this case. . . .*
>
> *So his area of expertise in his job is accident reconstruction—how the crash occurred and answer the question as to why. And that would be the—the area that this Court finds he qualifies as an expert and is permitted to proffer an opinion.*

RP at 1493-94 (emphasis added).

31

Once the jury returned to the courtroom, the prosecutor began questioning

Detective Corkins, when the following exchange occurred:

> Q    Detective, in your investigation process, what else did you do?
> A   I generated a report based off of the photographs that I had seen where I had gone through and in my mind explained what I had just done to the—to you regarding the steps through the—the collision pictures.  How the vehicle moved, for the most part—we can't say it a hundred percent how the vehicle moved, unless you have it on video and watch it because the vehicles rotate so fast as they're going through the phases of a crash.
>       *I generated a report and I talked about who was sitting where in the vehicle and who got ejected and who didn't.*
> Q    *And so if we label the passenger and the driver as the who was in the vehicle—could you say whether the passenger or the driver or both were ejected?*

RP at 1560-61 (emphasis added).

Defense counsel immediately objected.  The court excused the jury.  Outside the

jury's presence, defense counsel argued the prosecutor had attempted to elicit testimony

in violation of the ruling prohibiting the witness from testifying about who was driving

and in what position.  Defense counsel moved for a mistrial and dismissal of the case.

The prosecutor defended the question, pointing out that there was no dispute that

someone was ejected, and arguing that the witness was qualified to identify whether the

driver or passenger was ejected.

The trial court then stated that it was "taken back" by the question because there

was no foundation laid for the witness to be qualified as an expert to offer this type of

opinion because the Trooper did not know what the occupants' injuries were.  Defense

counsel then renewed his motion for a mistrial. The court denied the motion, explaining

that it did not think the question went "so far beyond." RP at 1565. When the jury

returned, the court instructed the members to disregard the prosecutor's last question.

Defense counsel again renewed his motion for mistrial, citing *State v. Cook*, 17

Wn. App. 96, 484 P.3d 13 (2021). He argued that the prosecutor in Jarrett's case was the

same one in *Cook*, where he was found to have engaged in similar misconduct. The court

denied the motion, ruling that the prosecutor's conduct was "not so egregious or

cumulative as to be prejudicial to the Defendant." RP at 1922.

Later, during the prosecutor's rebuttal closing argument, he played the Snapchat

video for the jury again, then stated:

> And so, of course, that's the video that started the investigation on the right
> path. The wrong path was started by the statement by Mr. Jarrett at the
> time of the scene—at the scene of the accident when he spoke to law
> enforcement and he told them that he was the passenger. And they went on
> the wrong foot—they got—their trajectory was wrong, but it was fixed.
>
> And as you may recall, the Coroner, Ms. Colvin, told you that that
> night she started to get information that caused her to be concerned and she
> relayed that information to Deputy Taylor. And before Deputy Taylor even
> left the scene, he called the State Patrol again and the State Patrol came and
> they sent their tech specialist, Trooper Bruchman. And before it got dark,
> they were there; they were doing what they were supposed to do—even in
> the rain, they were doing what they were supposed to do. Because they

33

were acting as though it was a death investigation; because there was a death—again, no question about that.

*So we righted the ship*, if you will. The law enforcement agency's.

RP at 2129-30 (emphasis added). Defense counsel immediately objected, arguing that the prosecutor was vouching. The court sustained the objection and instructed the jury to disregard the emphasized statement above.

Defense counsel moved for a mistrial again following closing arguments. Defense counsel cited the prosecutor's comment that "we righted the ship," and argued that the prosecutor was vouching. The court denied the motion, explaining that it had instructed the jury to disregard the prosecutor's statement and that it thought the curative instruction was enough.

### B. *Prosecutorial Misconduct*

We review allegations of prosecutorial misconduct using the abuse of discretion standard. *State v. Brett*, 126 Wn.2d 136, 174, 892 P.2d 29 (1995). To "'establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial, [considering] the context of the entire record and the circumstances at trial.'" *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)). "Prosecutors have 'wide latitude' in closing argument, but their argument must be based on the evidence and must not misstate the applicable law." *State v. Crossguns*, 199 Wn.2d 282, 296-97, 505 P.3d 529 (2022). It is the defendant's burden

to prove that the conduct was improper and that it caused prejudice. *Crossguns*, 199 Wn.2d at 297.

A prosecutor commits misconduct when they personally vouch for a witness's credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

A prosecutor who states a personal opinion as to the credibility of witnesses or the defendant's guilt also commits misconduct. *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). "To determine whether the prosecutor is expressing a personal opinion about the defendant's guilt, independent of the evidence, we view the challenged comments in context." *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009).

Jarrett points to multiple instances of alleged prosecutorial misconduct. He first argues that the prosecutor's statement that "we righted the ship" in closing argument constituted the prosecutor's "personal opinion about the state's case and indirectly on Mr. Jarrett's guilt." He alleges that the prosecutor's use of the word "we" implied that the prosecutor was part of the investigation. The State argues that Jarrett's objection to the prosecutor's statement, and the court's ruling sustaining the objection, were incorrect. It contends that the prosecutor was not vouching but commenting on the poorly managed

investigation. It further argues that Jarrett fails to demonstrate how the trial court abused its discretion.

In the context of closing arguments, the use of personal pronouns such as "I" and "we" can be problematic if it conveys a personal opinion on the credibility of the evidence. Nevertheless, we will find misconduct "only when it is clear and unmistakable that the prosecutor is not arguing an inference from the evidence, but is expressing a personal opinion." *State v. Rodriguez-Perez*, 1 Wn. App. 2d 448, 460, 406 P.3d 658 (2017).

We agree with Jarrett that the prosecutor's comment, "we righted the ship," suggested that he was part of the investigation. Even considered in context, the pronoun "we" was not used collectively to refer to those who were participating in the trial. Instead, it referenced the subsequent investigation and mirrored the testimony of the investigator who testified to fixing mistakes made in the initial investigation and righting the ship.

Although we find misconduct, we conclude that Jarrett fails to establish prejudice or abuse of discretion. Defense counsel's objection was sustained, and the jury was instructed to disregard the comment. Juries are presumed to follow the court's instructions. *Kirkman*, 159 Wn.2d at 928. Defense counsel acknowledged as much after the jury was sent to deliberate when he stated: "I recognize the curative instruction is a proper remedy and not a mistrial." RP at 2142.

36

Last, Jarrett also makes a passing argument that "[a]t a certain point, the cumulative effect of the misconduct is going to have a detrimental effect on the defense's case." Appellant' Br. at 53. This argument is insufficient. If Jarrett is attempting to argue cumulative error,[11] he fails to cite and engage with any authority supportive of his argument. His lack of reasoned argument is insufficient to merit this court's consideration. *Holland*, 90 Wn. App. at 538. Nevertheless, having determined there was no error, we conclude that there was no cumulative error.

### C. Motions for Mistrial

Jarret next argues that the court abused its discretion by denying his motions for mistrial.

We review a trial court's decision on a motion for mistrial for abuse of discretion. *State v. Wilson*, 71 Wn.2d 895, 899, 431 P.2d 221 (1967). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). On the other hand, a "denial of a motion for mistrial should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010).

---

[11] The cumulative error doctrine applies when a combination of trial errors denies the defendant a fair trial, even if any one of those errors individually may not justify reversal. *In re Det. of Coe*, 175 Wn.2d 482, 515, 286 P.3d 29 (2012).

In determining whether a trial irregularity warrants a mistrial, we consider the three *Hopson*[12] factors. *State v. Garcia*, 177 Wn. App. 769, 776, 313 P.3d 422 (2013). The court weighs 1) the seriousness of the irregularity, 2) whether the irregularity involved cumulative evidence, and 3) whether the trial court properly instructed the jury to disregard the irregularity. *Hopson*, 113 Wn.2d at 284. The "trial court is in the best position to discern prejudice." *Garcia*, 177 Wn. App. at 777.

Jarrett first argues the prosecutor's questioning of Detective Corkins was a serious irregularity because it violated the trial court's ruling limiting Detective Corkins's testimony. The State responds that the question did not violate the court's ruling, and that in any event the court instructed the jury to disregard it.

Although the prosecutor's follow-up question to Detective Corkins came close to the line, it did not directly call for testimony barred by the court's ruling. The court had prohibited Detective Corkins from testifying about where Jarrett and Snitchuk were seated and the mechanisms of their injuries but permitted him to describe how the crash occurred. Detective Corkins testified that he generated a report "talk[ing] about who was sitting where in the vehicle and who got ejected," but he never actually specified who was seated where or who was ejected. The prosecutor then asked, "And so if we label the passenger and the driver . . . could you say whether the passenger or the driver or both

---

[12] *State v. Hopson*, 113 Wn.2d 273, 778 P.2d 1014 (1989).

were ejected?" RP at 1561. This question did not expressly call for Detective Corkins to identify the driver. On this record, there was no irregularity warranting a mistrial.

Even if the question could be characterized as irregular, the witness never answered the question, the trial court sustained defense counsel's objection, struck the question, and instructed the jury to disregard it. Again, we presume the jury followed its instructions. *Kirkman*, 159 Wn.2d at 928. Accordingly, the trial court did not abuse its discretion in denying Jarrett's motions for mistrial based on the prosecutor's question to Detective Corkins.

Jarrett also argues that the prosecutor's comment in closing that "we righted the ship" required a mistrial. *See* Appellant's Br. at 51-52.[13] Although we agree that the

---

[13] In this portion of Jarrett's brief, he also makes the following cursory argument:

> The prosecutor asked questions of Detective Frizzell which were aimed at vouching for the state's [sic] case. (RP 1931). The prosecutor asked a question of the investigator which shifted the burden to the defense to produce evidence. It is improper for the prosecutor to shift the burden of proof.

Appellant's Br. at 48-49.

We decline to review this argument for a few reasons. First, Jarrett raises this issue for the first and only time in the context of his denial of a mistrial argument. However, trial counsel did not move for a mistrial on this basis. Nor did defense counsel object on the shifting burden ground Jarrett identifies now. As a result, this issue is unpreserved. RAP 2.5(a). Moreover, Jarrett's argument is wholly insufficient. He makes no effort to explain why the prosecutor's question in this particular instance constituted vouching or shifted the burden of proof to the defense. Instead, he seems to point us to the record so that we see that defense counsel objected on vouching grounds hoping we will do the rest of the work. We decline the invitation. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland*, 90 Wn. App. at 538.

comment was misconduct, we find no abuse of discretion in denying the motion for a mistrial. The trial court immediately instructed the jury to disregard the comment. The instruction was sufficient to dispel any potential prejudice. As a result, the court's denial of Jarrett's mistrial motion on this basis was not an abuse of discretion.

5. MOTION FOR RESENTENCING

Jarrett contends the trial court erred in granting the State's CrR 7.8 motion to correct his offender score. He argues the court's order did not cite any subsection of CrR 7.8(b) and none applied. The State responds that this claim is unpreserved because defense counsel objected on other grounds below. Alternatively, the State argues the trial court properly granted relief under CrR 7.8(b)(1) or (b)(5). While we agree that the issue was not preserved, we hold that the trial court did not err in granting the State's motion for resentencing, which was based on CrR 7.8(b)(1).

*A. Additional Background*

One week after sentencing, the State moved for relief from judgment under CrR 7.8 citing an "erroneously calculated offender score." CP at 354. The State argued that Jarrett's offender score should have included his juvenile conviction and been calculated at "2." It cited the State's mistaken view that the recent amendment of RCW 9.94A.525 precluded including Jarrett's juvenile conviction in the offender score as the reason for its miscalculation. The State argued that the motion was proper under CrR 7.8(b)(1) for a

40

mistake, and under the CrR 7.8(b)(5) catchall authorizing relief for any other reason justifying relief from operation of the judgment.

The trial court subsequently held a hearing on the State's motion. During the hearing, defense counsel objected to the State's motion on double jeopardy and judicial estoppel grounds. Following argument, the court granted the State's motion and, based on the recalculated offender score of "2," resentenced Jarrett to 110 months of confinement and 18 months of community custody. The court later filed a written order granting the State's motion.[14]

### B. Issue Preservation

As discussed above, we generally will not consider an issue raised for the first time on appeal. RAP 2.5(a). Jarrett opposed the State's CrR 7.8 motion in the trial court, citing double jeopardy and judicial estoppel. He did not argue that the State's motion failed to satisfy any particular subsections of CrR 7.8(b). Because Jarrett now advances a new theory, the issue is not preserved. Nor does he identify any exception to RAP 2.5(a) that might apply. Nevertheless, we exercise our discretion to address the substantive issue. RAP 2.5(a).

---

[14] Jarrett did not separately appeal the trial court's order granting the State's CrR 7.8 motion and failed to assign error to any of the court's findings and conclusions.

### C. *Jarrett's CrR 7.8 Arguments*

We review a trial court's ruling on a CrR 7.8 motion for an abuse of discretion.

*State v. S.M.*, 100 Wn. App. 401, 409, 996 P.2d 1111 (2000). CrR 7.8(b) provides:

> On motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons:
>
> (1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;
>
> . . . .
>
> (5) Any other reason justifying relief from the operation of the judgment.

A court has jurisdiction under CrR 7.8 to correct an erroneous sentence. *State v.*

*Hardesty*, 129 Wn.2d 303, 315-16, 915 P.2d 1080 (1996). Relief under CrR 7.8(b)(5) is

limited to "extraordinary circumstances not covered by any other section of the rule."

*State v. Keller*, 32 Wn. App. 135, 140, 647 P.2d 35 (1982). CrR 7.8(b)(5) is inapplicable

when the alleged circumstances justifying relief existed at the time the judgment was

entered. *State v. Gomez-Florencio*, 88 Wn. App. 254, 259, 945 P.2d 228 (1997).

Jarrett contends that the trial court abused its discretion because the order granting

resentencing failed to specifically identify which subsection of CrR 7.8(b) it relied on.

Regardless, he cites *State v. Lamb*, 175 Wn.2d 121, 285 P.3d 27 (2012) and argues that

none of the legal grounds enumerated in CrR 7.8(b) support the court's order.

Jarrett's reliance on *Lamb* is misplaced. In *Lamb*, the trial court granted the defendant's motion to withdraw an earlier plea to a juvenile adjudication, holding that denying the motion would constitute "a manifest injustice." *Lamb*, 175 Wn.2d at 128. The Supreme Court pointed out that while a manifest injustice would support a motion to withdraw a plea under CrR 4.2(f), it did not support Lamb's post-judgment motion. *Id*. at 128. Instead, the appropriate rule was CrR 7.8. *Id*. The court went on to hold that not only did the trial court fail to apply CrR 7.8, but Lamb's motion failed to meet the standards of CrR 7.8. *Id*.

In this case, while the trial court's order did not identify which subsection it found applicable, the State's motion invoked both CrR 7.8(b)(1) and (b)(5). Jarrett contends that CrR 7.8(b)(5) does not apply and we agree. As Jarrett points out, subsection (b)(5) is inapplicable when the alleged circumstances justifying relief existed at the time the judgment was entered. *Florencio*, 88 Wn. App. at 259. Here, Jarrett's juvenile conviction and the governing law were already in existence at the time of sentencing.

However, Jarrett fails to acknowledge the applicability of CrR 7.8(b)(1). Under this subsection, relief from judgment may be granted for mistake. The trial court characterized the error as the State's "mistake" in assuming the amendment to RCW 9.94A.525 applied retroactively to exclude Jarrett's juvenile conviction. The court's order is therefore best understood as granting relief under subsection (b)(1).

43

Nevertheless, Jarrett likens his case to *Florencio*, but that case is distinguishable. There, the State filed a motion requesting the defendant be resentenced because the department of corrections uncovered two prior convictions that were not calculated in the defendant's offender score. *Id*. at 256. The court resentenced the defendant using the two prior convictions, increasing the defendant's sentence based on increased presumptive sentence ranges. *Id*. at 257. On appeal, the issue was whether the evidence justified revising the defendant's sentence upward for "excusable neglect" by the prosecutor. *Id*. at 258-60. The court explained that because there was no evidence explaining why the convictions were not discovered at the time of the original sentencing, there was no basis for finding the error was the result of "excusable neglect." *Id*. at 259-60. The court held that the trial court's reliance on CrR 7.8(b)(1) was therefore factually unsupported and found abuse of discretion. *Id*. at 260.

But *Florencio* addressed "excusable neglect," not "mistake" as is at issue in Jarrett's case. Here, the prosecutor argued CrR 7.8(b)(1) applied due to the legal mistake about the retroactivity of the amendment to RCW 9.94A.525. And the court appeared to decide the case on that basis. Thus, *Florencio* does not help Jarrett. As we noted above, Jarrett advances no authority challenging the trial court's reliance on the "mistake" ground. Where no authority for an assertion is made, we may presume none exists.

No. 40241-0-III
*State v. Jarrett*

*DeHeer v. The Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193

(1962). On this record, we conclude that the trial court did not abuse its discretion.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Staab, A.C.J.

WE CONCUR:

_____
Fearing, J.P.T.[†]

_____
Cooney, J.

---

[†]George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).